UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

GLOBAL LAB PARTNERS, LLC, et al.,

     Plaintiffs,

v.                                    CASE NO. 3:18cv246-MCR/CJK

DIRECTMED DX, LLC, et al.,

     Defendants.

_____/

## ORDER

Pending before the Court is Plaintiffs' Emergency Petition for a Temporary Restraining Order ("TRO"), ECF No. 4. On consideration, the Court finds that the motion is due to be denied, but it will be converted into a motion for a preliminary injunction, and a hearing will be scheduled.

**Background**

The record reflects that "DHTX was formed for the primary purpose of marketing and processing medical tests for urinary tract infections, drug screening, and anatomic pathology through Cedar Creek Labs, LLC, a facility wholly owned

CASE NO. 3:18cv246-MCR/CJK

by DHTX."[1]  ECF No. 4-4, ¶ 8.  Plaintiff GLP bought a 50% interest in DHTX from Defendant Dividend Health LLC in December 2016.  "DHTX was to operate a medical lab licensed in Texas under the name Cedar Creek Labs" to perform the testing of urinary tract specimens provided by caregivers and other labs. ECF No. 4-4, ¶4.  GLP and Dividend Health signed a Membership Interest Purchase Agreement in December 2016 which contains a noncompetition agreement and identifies Escambia County, Florida, as the agreed venue and Florida law as controlling.[2]  Plaintiff GLG purchased a 5% interest in DHTX in March 2017 (2.5% from each GLP and Dividend Health).  DHTX is owned by Dividend Health LLC, which in turn is wholly owned by Defendant Ty Bruggemann.  Bruggemann also owns a separate LLC, DirectMed DX LLC, which is managed by Dividend Health.

In the accompanying affidavit of James "Woody" Dillard, GLP's representative, Dillard states that in July 2017, he discovered that no profits were being generated by DHTX, despite reports by Bruggemann that there were "brisk orders for testing."  Dillard states he was forced to personally guaranty loans to DHTX in an amount exceeding $1 million.  He sent a letter to Bruggemann on

---

[1] No complaint has yet been filed, but the petition requesting a TRO is accompanied by affidavits and evidence.

[2] Diversity jurisdiction is satisfied.

November 2, 2017, requesting copies of accounts and ledgers of DHTX, which were never *entirely* furnished. Dillard also states that he learned in January 2018, after comparing expenses to investments, that a sizeable amount of collections from operations were unaccounted for.

In addition, Dillard and Eni de la Osa, a representative of Plaintiff GLG, both state by affidavit that prior to GLG's purchase of its interest in DHTX in March 2017, Bruggemann represented to them that he was in the process of negotiating a contract between DHTX and Cirrus DX, Inc. ("Cirrus"), for a unique device that is "capable of changing the way patient care is delivered by doctors around the world." ECF No. 4-4, ¶6. Through this anticipated contract with Cirrus, DHTX would be responsible for marketing the medical tests and providing financing as well as a lab facility known as Cedar Creek Labs, and both DHTX and Cirrus would own the equipment necessary to process the lab results. Eni de la Osa stated that the contract with Cirrus was vital to GLG's decision to participate in DHTX.

GLP and GLG learned on January 18, 2018, that Bruggemann had instead negotiated a separate contract with Cirrus for the benefit of his solely owned LLC, DirectMed. Dillard asserts that because of DirectMed's nonperformance on the Cirrus contract, it is in danger of being cancelled. Dillard states that when Bruggemann was confronted with his knowledge of this, Bruggemann agreed to

CASE NO. 3:18cv246-MCR/CJK

transfer ownership of DirectMed to DHTX and to the Cedar Creek Lab facility. But according to Dillard, this transfer never occurred. He does not state when he learned this, however. The record shows that Bruggemann sent an email dated February 1, 2018, titled "DirectMed Ownership Transfer," in which Bruggemann provided estimates for immediate and long-term capital operating needs and indicated a willingness to "work together to make this happen throughout 2018." ECF No. 4-5. The email outlines a proposed plan that offers a "preliminary structure and concept," listing various additional capital investments needed and salary requests over a two-year period. It also states, "[i]n the meantime, we will work together to bring Cedar Creek Labs fully operational while folding in the ownership of DirectMed into DHTX." The email closes with a request for a response so the appropriate documents could be prepared to consummate the deal. Dillard characterizes this email as "a list of demands." ECF No. 4-4, ¶ 12.

Dillard states that he learned on February 9, 2018 that Bruggemann had failed to file the required organizational documents with the Secretary of the State of Texas to evidence his membership interest in DHTX and Cedar Creek Labs and that Cedar Creek Labs did not have an assignment of the necessary license under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA") to operate under CLIA. Dillard and Eni de la Osa also each state that state that their investment is in

jeopardy; that as of February 9, 2018, Bruggemann was threatening to shut down DHTX; and that Bruggemann has the ability to do so under the DHTX Company Agreement.

As a result, Plaintiffs filed this emergency request for a TRO. Although no complaint has yet been filed, the affidavits indicate that GLP and GLG seek to remove Bruggemann from overseeing DHTX's operations. The motion represents that Bruggemann's Cirrus contract is a breach of the noncompete agreement between GLP and DirectMed, that Bruggemann has interfered with DHTX's negotiations of a contract with Cirrus, and that Bruggemann failed to file corporate records and denied Plaintiffs access to DHTX's books and records, contrary to the Membership Interest Purchase Agreement. Plaintiffs request an order enjoining Defendants from violating the noncompetition agreement or taking any action to jeopardize Plaintiffs' interests in DHTX by transferring assets; ordering Defendants to provide Plaintiffs with reasonable access to DHTX financial records pursuant to the Membership Interest Purchase Agreement; and requiring Defendants to pay all costs and attorney's fees of the action.

**Discussion**

The Federal Rules of Civil Procedure provides that an *ex parte* TRO may issue only if (1) "specific facts in an affidavit or a verified complaint clearly show that

immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and (2) "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b). Also, the court may issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The following elements must be shown to obtain a TRO:

(1) a substantial likelihood of success on the merits;

(2) irreparable harm to the moving party if the TRO is not issued;

(3) the threatened injury outweighs any harm to the nonmoving party if the TRO is entered; and

(4) the TRO is not adverse to the public interest.

*See Parker v. State Bd. of Pardons and Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001). The plaintiff bears the burden of proof, and it is a heavy one to bear because a preliminary injunction, or temporary restraining order, in advance of trial "is a powerful exercise of judicial authority" that has been called an "extraordinary and drastic remedy." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1284 (11th Cir. 1990). Its "chief function . . . is

CASE NO. 3:18cv246-MCR/CJK

to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Id.* The relief is grounded in "irreparable harm and inadequacy of legal remedies." *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). The Eleventh Circuit has cautioned that "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *Id.*

Generally, under Florida law, "[e]vidence that an enforceable covenant not to compete was breached" will support a finding of the "likelihood of success on the merits." *Atomic Tattoos, LLC v. Morgan*, 45 So. 3d 63, 66 (Fla. 2d DCA 2010). However, to show irreparable harm, there must be "a serious injury that cannot be quantified," such as "the loss of a central, key component of the business, even if the business as a whole is not destroyed immediately," A*BC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1309 (S.D. Fla. 2008); "a substantial loss of business and perhaps even bankruptcy," *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975); "the loss of customers and goodwill," *Ferrero v. Assoc. Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991); or a loss of "goodwill and market position," *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1320 (11th Cir. 2010). *See also Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (irreparable injury can be found "[e]ven when a later money judgment might undue an alleged injury" but only if damages are "difficult or impossible to calculate" (internal quotation marks omitted)); *Atomic*

*Tattoos*, 45 So. 3d at 66 (finding damages difficult to determine from loss of goodwill and breach of covenant not to compete). Also, an injunction to protect a covenant not to compete and legitimate business interests can be found to serve "important public interest considerations." *Atomic Tattoos*, 45 So. 3d at 66.

After carefully reviewing the record, the Court finds that Plaintiffs have not shown an irreparable injury of such immediacy as to warrant a TRO or that they lack an adequate remedy at law. They contend that their investment is in jeopardy and their anticipated contractual relationship with Cirrus was frustrated, but there is no allegation that Cirrus in fact was under contract with DHTX, and it is difficult to understand how the failure of negotiations at some unknown time (that were represented as ongoing in March 2017) only now has ripened into an immediate threat of harm. Dillard has known since July 2017 that MHTX was underperforming, since November 2017 that documents were not all being provided to them, and since January 18, 2018 that DirectMed was contracting with Cirrus.

Although it is true that the breach of a contractual noncompetition clause can constitute irreparable injury, Plaintiffs cite no case law at all in support of their argument that they have suffered an immediate and irreparable injury on these facts and the record does not substantiate the claim at this time. To the contrary, the record indicates that on February 1, Plaintiffs received an opportunity to negotiate with

CASE NO. 3:18cv246-MCR/CJK

Bruggemann over ownership of DirectMed, which has the contract with Cirrus, and that Plaintiffs in fact are concerned over DirectMed's nonperformance as potentially jeopardizing the Cirrus contract. To the extent Plaintiffs contend Cirrus was a key component of the DHTX business, there is no allegation that DHTX actually consummated a contract as a result of the negotiations that occurred in March 2017. It simply is not evident on this record why DHTX's loss of that contract opportunity presents an imminent danger to the company now. Moreover, there is no allegation that sensitive matters are at issue that could not be remedied monetarily and thus would warrant emergency action—there is no claim of a threat of disclosure of trade secrets or confidential information, loss of goodwill or market position, or loss of employees. The only immediate threat is that Bruggemann now threatens to shut down DHTX, but Plaintiffs admit that Bruggemann has the ability to do this under the company agreement.

In addition, the motion makes no provision for security or any recommendation as to the appropriate amount of security that would satisfy Rule 65(c). Plaintiffs do not represent why notice should not be required of them and in fact provided Defendants notice of the motion for a TRO.[3] The Court finds that the

---

[3] One court has stated that where notice is initiated, it "in essence eliminates the request for a TRO." *United Subcontractors, Inc. v. Godwin*, No. 11-81329-CIV-Hurley/Hopkins, 2011

CASE NO. 3:18cv246-MCR/CJK

interests of justice in this instance call for notice and a chance for Defendants to respond, and thus the emergency request for a TRO will be denied. However, the Court's denial of Plaintiffs' request for an emergency TRO is not a decision on the merits of preliminary relief. The Court will convert the motion into a motion for a preliminary injunction to be decided after notice, expedited briefing, and a hearing on the matter.

Accordingly, the Emergency Petition for a Temporary Restraining Order, ECF No. 4, is **DENIED in part** in so far as it seeks a TRO and **DEFERRED in part** and converted to a motion for a preliminary injunction, to be determined as follows:

1.      Plaintiffs are directed to file a Complaint within seven (7) days and to serve a copy of the Complaint, this Order, and the motion, ECF No. 4, on Defendants. Plaintiffs are further directed to file proof of service on the docket.

2.      Plaintiffs have fourteen (14) days to file supplemental briefing on the converted motion for preliminary injunction.

---

WL 13228999, at *2 (S.D. Fla. Dec. 12. 2011) (Report and Recommendation recommending the denial of a TRO on allegations of breach of a noncompete agreement), *adopted by* 2012 WL 13019740 (S.D. Fla. Jan. 3, 2012).

CASE NO.  3:18cv246-MCR/CJK

3.      Defendants' response brief to the motion, ECF No. 4, is due within twenty-one (21) days of service.  Plaintiffs may file a brief reply limited to seven (7) pages within seven (7) days after the filing of Defendants' response.

4.      An evidentiary hearing is scheduled to begin at 1:00 p.m. Central Time on Thursday, March 29, 2018, to be held in the Second Floor Courtroom, Winston E. Arnow Federal Building, 100 N. Palafox Street, Pensacola, Florida.  Two hours have been reserved on the Court's calendar.

**DONE AND ORDERED** this 14th day of February 2018.


*M. Casey Rodgers*
**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**

CASE NO.  3:18cv246-MCR/CJK