**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | | |
|---|---|---|
| **GLOBAL LAB PARTNERS, LLC,** | § | |
| **and GLOBAL LAB GROUP, LLC,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **No. 3:18-cv-00246-MCR-CJK** |
| | § | |
| **DIVIDEND HEALTH LLC,** | § | |
| **DIRECTMED DX LLC, and** | § | |
| **TY H. BRUGGEMAN, individually,** | § | |
| | § | |
| **Defendants.** | § | |

**DEFENDANTS' RESPONSE TO PLAINITFFS' MOTION FOR**
**PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW**

**I.      SUMMARY OF RESPONSE**

1.      Global Lab Partners, LLC ("GLP") and Global Lab Group, LLC ("GLG") (collectively "Plaintiffs") come before this Court with half truths, rank speculation and outright red herrings for one reason – to attempt to regain an opportunity that they lost through their own misdeeds and odious past.  Their very first overreaching request for relief – that the Court order Dividend Health LLC  ("Dividend") to transfer its wholly owned subsidiary DirectMed DX LLC ("DirectMed") into DHTX Partners LLC ("DHTX") – belies their goal of unjustifiably gaining control of DirectMed.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   1**

Plaintiffs are merely using this litigation as a negotiating tactic at the expense of, and in violation of their fiduciary duty to, DHTX.

2.      As demonstrated in detail below, Plaintiffs have not met their burden to show they are entitled to a preliminary injunction.  In support of their request, Plaintiffs impermissibly seek to assert DHTX's alleged causes of action for conversion and tortious interference with business relations without making DHTX a party to this matter or following the strictures of either federal or Florida law with respect to derivative actions.

3.      With respect their allegations of breach of contract, Plaintiffs rely upon a contractual provision that is no longer enforceable, plead alleged minor speculative violations of the contract with no specific facts to substantiate such allegations, and plead no specific facts to support an alleged non-compete violation.

4.      Finally, with respect to their claim for fraudulent inducement, Plaintiffs own pleadings show that the alleged misstatements by Defendants were in fact true as stated and plead no specific facts to the contrary.

5.      Plaintiffs are now frustrated by the fact that while they were initially provided with a full and fair opportunity to participate in an investment that is now owned by DirectMed, they squandered that opportunity and are now seeking a second bite at that apple.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   2**

## II.   FACTUAL BACKGROUND

6.   DHTX is a Texas Limited Liability Company and is currently governed by the First Amended Company Agreement of DHTX Partners, LLC (the "DHTX Agreement") effective on December 22, 2016.  *See* Exhibit A.   On the same date, Dividend and GLP entered into the Membership Interest Purchase Agreement (the "MIPA") (*see* Exhibit B) whereby GLP acquired 50% of the membership interests of DHTX, making both Dividend and GLP owners of 50% of the membership interests of DHTX.  Also, on December 22, 2016, by unanimous consent of DHTX's members, Dividend and GLP were each appointed as managers of DHTX. *See* Exhibit C.  Thereafter, on March 22, 2017, DHTX entered into a Share Transfer & Limited Dilution Agreement (the "Share Transfer Agreement"), (*see* Exhibit D) with Global Lab Group, LLC ("GLG"), wherein both Dividend and GLP each transferred 2.5% of their membership interests in DHTX to GLG.  Accordingly, the current members of DHTX are as follows: Dividend – 47.5%; GLP – 47.5%; and GLG – 5%.

7.   DHTX is the sole owner of Cedar Creek Labs, LLC ("CCL"). CCL consists of a 6630 square foot clinical laboratory in Austin, Texas that has been implementing the capability to run toxicology, blood wellness, molecular urinary tract infection and clinical pathology tests.  CCL is the

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   3**

primary business, and only means of generating revenue, of DHTX. However, as explained in more detail below, CCL has never become fully operational because of GLP's failure to provide the funding in a manner that that it initially committed to provide.

### A.    *The Cirrus Fiasco*

8.    In the Fall of 2016, before it sold membership interests to GLP, Dividend had already begun negotiations with a company called Cirrus DX, Inc. ("Cirrus") for the right to exclusively market certain proprietary Lab Developed Tests ("LDT's") to be run in CCL.  After Dividend and Cirrus had reached a preliminary agreement on essential terms, it became clear to Dividend that it was going to have to raise a significant amount of capital to both finish out the CCL lab as well as consummate the envisioned transaction with Cirrus.  Because of its need for capital, Dividend began negotiating with GLP to invest in DHTX as well as to fund the Cirrus transaction if final terms could ultimately be negotiated.  As GLP admits in its motion (*see* Doc. 12 p. 7) both Dividend and GLP understood, and GLP represented, that one of its primary commitments was to provide financing for the contemplated Cirrus transaction.  Accordingly, it is true that Dividend disclosed to GLP, prior to the GLP's investment in DHTX, Dividend's ongoing negotiations between itself and Cirrus, and

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   4**

contemplated that, if GLP invested in DHTX, any future agreement with Cirrus would be consummated with DHTX and would be funded by GLP. However, prior to GLP's investment in DHTX, neither Dividend nor Mr. Bruggemann ever represented that it had finalized an agreement with Cirrus, nor guaranteed that any such an agreement would ultimately be consummated.

9.     After GLP invested in DHTX, in late 2016 and early 2017, Dividend and GLP, on DHTX's behalf, worked together to finalize the deal and reach an agreement between DHTX and Cirrus.   True to its word, on or about March 27, 2017, Dividend delivered a proposed final agreement, only requiring execution and funding, whereby DHTX, through GLP, would provide $1.1 million in capital to allow DHTX to acquire the exclusive rights to market and process urinary tract infection and bacterial vaginosis specimens with LDTs manufactured by Cirrus as well as joint ownership of the intellectual property attached thereto.  *See* Exhibit E. However, when all parties gathered at GLP's offices[1] on or about March 30, 2017 for the closing of this transaction, GLP failed to provide the funding as agreed, and attempted to renegotiate the deal.  In that meeting were Cirrus Executives, Dr. Tom Huard from MED-US Consulting, Ty Bruggemann from Dividend,

---

[1] One or more of GLP's owners are members of what is known as the South Pallofax Group ("SPG").  GLP's offices are in the same offices as SPG.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   5**

and Alex Cover, John Levitan, Mark L'Hommedieu, Dan Levitan and Woody Dillard from GLP & SPG.  Alex Cover, Mark L'Hommedieu and John Levitan took control of the meeting and attempted to completely renegotiate the deal predominately by removing GLP and SPG's obligation to fund the $1.1 million that had already been agreed upon. After those negotiations failed, the Cirrus executives were furious and left without consummating the transaction.  Thus, it appeared at this point that GLP's failure to fund the Cirrus transaction as it had promised had ruined the Cirrus deal for DHTX.

**B.** *Cirrus vows to not to grant the IP to DHTX or SPG.*

10.    After the fiasco caused by GLP's failure to fund the transaction with Cirrus, Cirrus conducted its own background investigation into certain members of SPG.  What it found shocked Cirrus!

11.    GLP's membership interests are owned as follows: James "Woody" Dillard – 50%; Clyde Petroni – 21%; Ken Ritchey – 14%; Kathleen VanAlysteen – 11%; Jim Riggins – 3%; Dave Dugas – 1%.  While the GLP membership interests held by Mr. Dillard are in his name individually, there seems to be some shadowy arrangement between Mr. Dillard and SPG whereby Mr. Dillard holds GLP's membership interests in trust for certain of SPG's principals.  As evidence of this, it was two of

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   6**

SPG's managing members, Alex Cover and John Levitan that spearheaded the attempted renegotiation of the Cirrus contract. Woody Dillard said little, if anything, in that failed renegotiation attempt.

12.    SPG names the following persons as their "Managing Partners": Alexander Cover – Chief Executive Officer; John D. Levitan – Chief Development Officer; Mark L'Hommadieu – Chief Marketing Officer; and James "Woody" Dillard – Managing Principal. *See* https://www.southpalafox.com/our-team.    It also lists Daniel Levitan, brother of John D. Levitan, as a member of the SPG "team." *Id*. Other than Mr. Dillard, the other four men have criminal convictions and/or civil judgments involving fraud, money laundering, RICO violations, and/or tax evasion.

13.    In 1991, Mr. Cover, SPG's Chief Executive Officer, was arrested by the Escambia County Sherriff's office on 5 counts of racketeering, 34 counts of felony grand larceny, 18 counts of securities fraud, and 2 counts of petty larceny. *See* Exhibit F. Mr. Cover ultimately pled guilty and was convicted of felony grand theft in 1994 receiving 5 years probation as well as the misdemeanor offense of making a false statement for which he received 1 year of probation. *See id*. On April 22, 2012, Mr.

Cover was again arrested, this time for battery involving domestic violence, a first-degree misdemeanor that was ultimately dropped or abandoned.

14.     In 1995, SPG's Chief Development Officer, John D. Levitan, along with SPG team member Daniel Levitan, were caught in a sting operation involving the Palm Beach County Sherriff's office and the Internal Revenue Service whereby they attempted to launder money which they believed to be the proceeds of illegal drug operations.  *See* Exhibit G.  As their part of the conspiracy, the Levitan brothers conspired to accept illicit drug money, disguise it as a capital investment in their pawnshop operations, and then launder the money by characterizing its repayment as employee salaries.  *See id*.  John Levitan was ultimately convicted of conspiracy to launder money and attempt to launder money proceeds from unlawful criminal activity receiving prison terms therefor of 60 months and 168 months, respectively, as well as a $25,000.00 fine.  *See id*.  Dan Levitan was convicted of the same crimes receiving prison terms therefor of 60 months and 155 months, respectively, as well as a $12,500.00 fine.  *See id*.

15.     While SPG's Chief Marketing Officer, Mark L'Hommadieu, appears to have escaped criminal conviction, in 2010, he agreed to a judgment of $100,000.00 plus interest costs in a case where he was sued under the civil RICO statute for, among other things, engaging in illegal

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   8**

schemes including "fraudulent and illegal fee-splitting, altered medical bills, billing for treatment not rendered, excessive and medically unnecessary electrodiagnostic tests, MRIs, durable medical equipment, and rehabilitation services." *See* Exhibit H.  Mr. L'Hommadieu not only agreed to money damages, but the terms of his agreed judgment included the following prohibition:

> Defendant L'Hommadieu, including any corporations or other entities in which he maintains an ownership interest or billing control, is prohibited from billing any Plaintiff[2] for provision of medical treatment, diagnostic testing, or durable medical equipment or related supplies, to any person insured by any Plaintiff or to any of Plaintiff's subsidiaries, divisions or departments.

*See* Exhibit I docket entry No. 353.

16.    Finally, in addition to his federal criminal record discussed above, Dan Levitan has a considerable criminal record involving numerous violations of Florida state law including 8 different arrests between 1986 and 2009 for charges including felony larceny, grand theft, fraud by check, other fraud related charges, and various probation violations.  *See* Exhibit J.  For

---

[2] Plaintiffs in this lawsuit were all insurance companies including, Grange Mutual Casualty Company, Grange Indemnity Insurance Company, Trustgard Insurance Company, Allstate Insurance Company, Liberty Mutual Insurance Company, Liberty Insurance Corporation, Liberty Mutual Fire Insurance Company, The First Liberty Insurance Corporation, LM Insurance Corporation, Indiana Insurance Company and Employees Insurance of Wassau. *See* Exhibit H.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   9**

these crimes, it appears that he has been to prison on at least two different occasions. *Id*.

17.     This panoply of fraud-related arrests, convictions and civil judgments against the SPG management and other team members explains why none of SPG's management, other than Mr. Dillard, is named anywhere in the ownership of GLP, and why SPG maintains its shadowy ownership of GLP through Mr. Dillard.   In any event, once Cirrus discovered SPG management's checkered background, coupled with the manner in which SPG attempted to re-negotiate the terms of the proposed agreement with DHTX at the closing, it flatly refused to consummate any transaction whereby the intellectual property related to the LDT's would be owned by any entity in which GLP, or specifically SPG, had any ownership interest.

**C.     Dividend saved the Cirrus deal and secured the LDT's for CCL.**

18.     A little over a week after GLP queered the Cirrus deal for DHTX, on or about April 8, 2017 Cirrus contacted Dividend through Mr. Bruggemann to inquire if Dividend would be interested consummating a deal on its own.   However, Cirrus made it clear that it would not agree to any transaction whereby any intellectual property rights would be acquired by GLP or specifically by the South Pallofax Group or any of its members. While Dividend agreed that it could create a separate company to hold the

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   10**

LDT's intellectual property rights, it stipulated that the actual tests would have to be run through CCL that was wholly owned by DHTX.  Cirrus was amenable to this structure, and so on or about April 10, 2017, Dividend created DirectMed to consummate the agreement with Cirrus.

19.    Dividend ultimately reached a final agreement with Cirrus, through its wholly owned subsidiary DirectMed, and on April 19, 2017, entered into a Product Development and Exclusivity Agreement with Cirrus (the "DirectMed Agreement") (*see* Exhibit K) giving DirectMed, among other things, the exclusive right to market two LDT's, in addition to other funding obligations.    Approximately one week after DirectMed consummated the DirectMed Agreement, on April 24, 2017, it entered into an Exclusive Subcontractor Agreement with CCL (the "Subcontractor Agreement") (*see* Exhibit L) giving CCL the exclusive rights to run the LDT's in its lab.

20.    Therefore, in spite of GLP's failure to secure the money it promised to fund the Cirrus deal with DHTX, Dividend was able to save the deal with Cirrus, and to provide CCL with the ability to run the LDT's in its lab.[3]  Importantly, the Subcontractor Agreement provides, in part, that:

---

[3] The revenues related to the Cirrus LDT's account for over 70% of CCL's total revenues as of 2/10/18.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   11**

(a) DIRECTMED shall . . . [h]ereby authorize CCL to enter into agreements with Cirrus to purchase reagents from Cirrus as well as to reference samples to Cirrus.

(b) DIRECTMED shall . . . [h]ereby authorize CCL, for any tests that CCL performs in its lab related to the Assays . . ., to bill and collect for such testing. . . DIRECTMED hereby further authorizes CCL to retain all collections related to the Assays . . .not required to be remitted to Cirrus.  DIRECTMED hereby agrees that it shall not be compensated for lab tests related to the Exclusivity Agreement performed in the CCL Lab.

(c) DIRECTMED hereby agrees that during the term of this Agreement, so long as CCL complies with the terms and conditions of this Agreement, that CCL shall be its exclusive contractor with respect to the matters agreed to herein.

Exhibit L section 5.01(a)-(c). Shortly thereafter, on June 15, 2017, Cirrus and CCL entered into two separate agreements, the Lab Services Purchase Agreement and the Reagent Purchase Agreement (*see* Exhibit M), allowing Cirrus and CCL to conduct business related to the LDT's directly with Cirrus.[4]

21.    Accordingly, through the Subcontractor Agreement (*see* Exhibit L) and the Lab Services Purchase and Reagent Purchase Agreements (*see* Exhibit M), CCL acquired the exclusive right to run the LDT's in its Lab, bill and collect for them, and DirectMed agreed that it would not be

---

[4] For the Court's convenience, the Defendants have provided the chart in Exhibit N that shows the ownership structure described above as well as the parties to the various agreements described herein.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   12**

compensated in any manner for such tests.  Furthermore, CCL has the ability to purchase needed reagents directly from Cirrus and to use Cirrus as a reference lab as needed.  All of these rights were acquired by DirectMed in the DirectMed Agreement (*see* Exhibit K), and voluntarily and purposefully given over to DHTX through CCL so that Dividend would not be competing with DHTX or CCL's lab operations. The only part of the DirectMed Agreement that DirectMed retained, per Cirrus' requirement, was the exclusivity and intellectual property conveyed to DirectMed in the DirectMed Agreement, as well as the funding obligations directly related to such intellectual property. *See id*. at section 7.01.  To date, DirectMed has no employees, no lab, has collected no samples to be run at a lab, has conducted no lab tests nor referred any samples out to be tested at any lab, has collected no revenues, and does not even own a bank account.

22.    On behalf of Dividend, Mr. Bruggemann fully disclosed the Cirrus transaction to GLP both orally and in writing.  On May 17, 2017, after multiple phone calls with GLP's representatives, Mr. Bruggemann followed up with an e-mail explaining the resulting transaction.  *See* Exhibit O.  Because the principals of GLP were present at the failed closing and had been party to the numerous phone calls that preceded Exhibit O, Mr. Bruggemann did not feel it necessary to recount the circumstances

surrounding closing fiasco in its entirety, but rather summarized it by stating that the closing meeting in Pensacola with Cirrus "did not end well," and therefore Cirrus "elected not to do business directly with DHTX with regard to the Product Development and Exclusivity Agreement."  Furthermore, because these matters had already been fully discussed via multiple phone calls, Mr. Bruggemann also elected not to go into SPG's management's nefarious pasts. However, Mr. Bruggemann did disclose that Cirrus elected to contract separately with his own entity DirectMed, but that he had secured the right for DHTX, through CCL, to still run the LDT's and eventually to bring the point of care tests to market.

23.    When Mr. Bruggemann stated "[t]his [agreement] allowed us to maintain our relationship with Cirrus, which also ensured our ability to run the UTI at the DHTX Partners Laboratories and participate in the Point-of-Care Reagent Rental Program," this statement was absolutely true.   As detailed above, through the Subcontractor Agreement (Exhibit L), and later the Lab Services Purchase and Reagent Purchase Agreements (Exhibit M), DHTX, via CCL, had precisely that opportunity.  Accordingly, again true to its word, Dividend had saved the Cirrus deal, and conveyed all of the benefits of the lab testing related to the Cirrus LDT's directly upon DHTX and CCL.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   14**

**D.      GLP does not come to this Court with clean hands.**

24.     GLP has been a poor manager and fiduciary to DHTX from the start.  In fact, GLP has contributed little to DHTX's management and relied entirely on Dividend to manage DHTX and CCL.  For example, when GLP acquired its Membership interests in DHTX, it agreed to put in a total of $1 million set forth on the following schedule: $100,000.00 upon execution of Membership Interest Purchase Agreement (12/22/16), $100,000.00, no later than 12/27/16, $200,000,00 no later than 1/18/17, and $100,000.00 no later than 2/3/17, and the remaining $500,000.00 to be paid to Seller either in cash or "like kind" (defined as business or other consideration of equal value) at buyer's discretion, to be paid no later than 7/31/17.  However, GLP failed to contribute the funds as agreed, and thus starved DHTX of the cash that it needed for developing its operations and capital investment.  Even the evidence that Plaintiffs attached to their motion shows that they did not comply with the agreed upon funding schedule.  *See* Exhibit 9 p. 15 to Plaintiffs' Motion.  As this exhibit shows, rather than contributing the initial required $500,000 by no later than 2/3/17, it took GLP until 4/4/17 to meet the initial funding requirements.  Accordingly, rather than being able to fund overhead through revenue, because of the delays caused by GLP's violation of its agreement, DHTX had to use much of the initial $500,000 that GLP

ultimately contributed as overhead rather than for capital investment for which it had been planned.  Once DHTX got behind on planned capital investments, but had already added the overhead expenses in anticipation of receiving GLP's investment dollars, it was impossible to bring the CCL lab to operating status in order to generate sufficient revenue to offset overhead.  As a result, DHTX never had sufficient capital to bring CCL to full operational status.

25.     While GLP claims that it has "put several million dollars into DHTX and [CCL]" (Doc. 12 p. 2), what it fails to tell the Court is that Dividend has as much, if not more, at stake in DHTX.  As the MIPA shows, while GLP agreed to put $1 million into DHTX as a loan, Dividend had already put over $860,000 into DHTX.  *See* Exhibit B p. 3.  Furthermore, Dividend, and Mr. Bruggemann personally, have signed guarantees on an additional loan secured by DHTX for $1.2 million.  Finally, Dividend and Mr. Bruggemann individually, have signed guarantees on CCL's lease as well as its lab equipment that totals more than $2 million.  Accordingly, to suggest that Dividend and Mr. Bruggemann have no "skin" in this venture is simply not true.

26.     Dividend has, for the past several months, attempted to work with GLP to address operational deficiencies and seek out additional funding

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   16**

for DHTX all to no avail.  Rather than uphold its fiduciary duty to DHTX and work in good faith with Dividend to address these issues, GLP (and GLG) are intent on using DHTX's financial and operational issues as leverage to extort Dividend to sign over DirectMed to DHTX, without regard to the risk to the DirectMed Agreement.  As GLP concedes, DHTX is currently insolvent as it is unable to pay its bills as they become due.  In an effort to remedy this and to induce GLP to engage in additional fundraising efforts with Dividend, Mr. Bruggemann, after extensive negotiations via phone, e-mail and text, sent numerous e-mails with varying proposals for GLP and Dividend to work together to raise additional funds to secure DHTX's viability.  Rather than give the Court the full picture of these extensive negotiations, GLP chose to "cherry pick" one e-mail out of the many and couch them in terms of Mr. Bruggemann's "list of demands."

27.    As Mr. Bruggemann's February 1, 2017 e-mail began, his intent was to "establish a deal structure and concept so we can all move forward together with a healthy and profitable entity, DHTX Partners, LLC" with the short-term goal of bringing the lab to full operation status, and the long term goal of jointly raising capital to meet DHTX's future financial needs. *See* Exhibit P.  Contrary to the Plaintiffs' assertion that Mr. Bruggemann demanded "$6,000,000.00 in new capital," what the e-mail

bears out is that he was proposing that Dividend and GLP "jointly undertake the effort to fund DHTX by end of 2018." *Id*.

28.    After a series of phone conversations regarding Mr. Bruggemann's initial e-mail, Mr. Bruggemann responded with a slight variation of the proposal later that same day, to which Clyde Petroni of GLP responded. *See* Exhibit Q.  As is clear from Mr. Petroni's e-mail, GLP did not consider Mr. Bruggemann's proposal a "demand" at the time, but rather a negotiation between business partners.  In fact, GLP was amenable to Mr. Bruggemann's proposal in concept, but was negotiating the dollar amounts. For example, with respect to Mr. Bruggemann's request for a salary and some type of bonus for the countless hours that he had already put in to the business, Mr. Petroni responded "25000 is not a problem the 200,000 is and a 20,000 a month salary is, I believe 10,000 a month is ok."  Accordingly, it is clear that GLP agreed that Mr. Bruggemann deserved some type of bonus to make up for the year plus that he had worked without salary as well as a monthly salary going forward, but were haggling over amounts. *Id*.

29.    Finally, on February 11, 2018 (after Plaintiffs filed suit but before Defendants had received notice thereof), Mr. Bruggemann sent yet another proposal laying out his long term goals for DHTX and clearly reiterating why DirectMed could not be part of DHTX without Cirrus'

approval.  *See* Exhibit R.   This proposal followed a call that Mr. Bruggemann had with Cirrus executives on February 9, 2018 where Cirrus again expressed its adamant opposition to SPG having any ownership rights to DirectMed.   With Cirrus' newly re-confirmed opposition to SPG, Mr. Bruggemann stated that, "Cirrus is adamantly opposed to doing business with the SPG. This was again made clear during a call with Cirrus executives on 2/9/18," and "DirectMed cannot be absorbed into any company owned or controlled by SPG (Something more creative will need to be implemented which does not put the DirectMed contract with Cirrus in jeopardy)."

30.    Therefore, it is clear that Mr. Bruggemann was walking a tightrope by trying to craft a proposal to put DHTX on firm financial footing, while not putting the DirectMed Agreement at risk, and at the same time attempting to shore up his personal financial position after having not being paid for over a year.  This he did in the face of continuous threats of litigation from his so-called partners.  Cirrus served itself well by refusing to do business with SPG.

31.    Accordingly, after refusing to fund the agreement with Cirrus on DHTX's behalf in violation of their fiduciary duties to DHTX, GLP has refused to work with Dividend to address the operational and funding needs

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   19**

of DHTX in an effort to blackmail Dividend into contributing DirectMed, and therefore the DirectMed Agreement into DHTX. The allegations that GLP and GLG make against Dividend and its Manager, Ty Bruggemann, are not only baseless, but, as Dividend has repeatedly advised them, the relief they seek would likely void the DirectMed Agreement to the detriment of DHTX, CCL, Dividend, GLP and GLG.  However, GLP and GLG's greed has blinded them to logic as well as to their fiduciary duties to DHTX.

## III.  LEGAL ARGUMENT

32.    In the Eleventh Circuit, a district court may grant injunctive relief only if the movant shows the following: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *See Keeton v. Anderson-Wiley*, 664 F.3d 865, 868 (11th Cir. 2011); *All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc*., 887 F.2d 1535, 1537 (11th Cir. 1989); *Carillon Importers, Ltd. v. Frank Pesce Intern. Group Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997).   Furthermore, a preliminary injunction is the "exception rather than the rule" and is "an extraordinary and drastic remedy not to be granted unless the movant clearly

establishes the burden of persuasion as to each of the four prerequisites." *Four Seasons Hotels And Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003); *All Care Nursing Service, Inc.*, 887 F.2d at 1537. In addition, "[t]he chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Ne. Florida Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1284 (11th Cir. 1990).

33.   Plaintiffs have alleged the following four (4) causes of action against Defendants to support their application for a preliminary injunction: fraud in the inducement; breach of the MIPA; tortious interference with business relations; and conversion of DHTX's assets.   *See* Doc. 12 p. 17-23.

34.   Based upon these four (4) causes of action, the Plaintiffs have asked for the following relief in the form of a preliminary inunction:

1.   Enjoin Defendants from . . . continuing to violate the MIPA by transferring the units of DirectMed to DHTX ("Request for Relief 1");

2.   Enjoin Defendants from . . . taking any action to jeopardize the Plaintiffs' interest in DHTX by transferring, disposing of, encumbering or otherwise disposing of any assets of DHTX or ceasing business operations of DHTX including terminating or failing to pay employees to force them to leave and cease lab operations; ("Request for Relief 2"); and

3.   Order Defendants Bruggemann and Dividend Health or other third party entities owned and controlled by

Defendants to provide Plaintiffs with reasonable access to DHTX financial books and records pursuant to the MIPA ("Request for Relief 3").

*See* Doc. 12 p. 2-3.

**A.  *Plaintiffs inappropriately attempt to bring causes of action for conversion and tortious interference with business relations on behalf of DHTX without following the strictures of either federal or Florida law controlling derivative actions.***

35.    In support of their claim for conversion, Plaintiffs allege that "Defendants converted DHTX assets for his [sic] own self-serving purpose . . . in that he usurped the Cirrus contract . . .," Defendants "utilized the DHTX Cedar Creek facility to support said contract," Defendants "diverted business opportunities from DHTX," and Defendants "Diverted DHTX resources."  *See* Doc. 12 p. 23.  In addition, in their Original Complaint, Plaintiffs allege that Defendants converted "DHTX assets including: the Cedar Creek Lab facility; business opportunities; project funding; administrative and financial support; and DHTX documents and confidential information," and "diverted business opportunities from DHTX and converted DHTX resources."  *See* Doc. 6. p 17-18.  Furthermore, in support of their claim for tortious interference with business relations, Plaintiffs have alleged that Defendants "intentionally and unjustifiably engaged in direct competition with the planned business operations of DHTX."  *See* Doc. 12 p. 22.    In Plaintiffs' Original Complaint, Plaintiffs allege that Defendants

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   22**

"intentionally interfered with DHTX's business relations with Cirrus." *See* Doc. 6 p. 16.   Accordingly, it is clear that the conversion and tortious interference with business relations causes of action alleged by Plaintiffs belong to DHTX rather than to Plaintiffs individually.

36.   Because Plaintiffs are attempting to assert DHTX's alleged claims for conversion and tortious interference with business relations, Plaintiffs are required by Rule 23 to make a demand on the members of DHTX or explain why such demand is futile prior to bringing suit on behalf of DHTX regarding such claims.   *See* Fed. R. Civ. P. 23.1; *Kamen v. Kemper Fin. Servis. Inc*. 500 U.S. 90, 95, 111 S. Ct. 1711, 114 L. Ed. 2d 152 (1991).   Pursuant to Rule 23.1, a member seeking to maintain a derivative action is required to allege with particularity in the complaint "either a pre-suit demand to the corporation's board of directors or forbearance of the demand because of futility." *Story v. Kang*, 2006 U.S. Dist. LEXIS 4354, 2006 WL 163078, *1 (M.D. Fla. 2006).   By so doing, "[a] pre-suit demand may be excused by a proper pleading of demand futility." *McCabe v. Foley*, 424 F.Supp.2d 1315, 1319 (M.D. Fla. 2006).   Furthermore, if such demand is not made, the Plaintiffs must plead "with particularity" why a demand was not made in order to support any claim of demand futility.  *Id*.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   23**

37.   In addition, pursuant to section 607.07401, Florida Statutes, in order to bring a derivative action, a plaintiff must:

> allege with particularity the demand made to obtain action by the board of directors and that the demand was refused or ignored by the board of directors for a period of at least 90 days from the first demand, unless, prior to the expiration of 90 days, the person was notified in writing that the corporation rejected the demand, or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period.

FLA. STAT. § 607.07401(2); Furthermore, "[i]n a stockholder's derivative action, the corporation on whose behalf the action is brought is an indispensable party." *Daniels v. Vann*, 396 So.2d 723, 723 (Fla. 4th DCA 1981) (stating that "[t]he absence of the corporate defendant as at least a nominal party serves to divest the court of jurisdiction as to this aspect of the case."); *see also Alario v. Miller*, 354 So.2d 925, 927 (Fla. 2d DCA 1978) (finding that "in a derivative action the corporation on behalf of which the stockholders sue is an indispensable party, and the court has no jurisdiction to adjudicate the rights of that corporation in its absence as a party . . . .").

38.   While Defendants deny Plaintiffs' allegations in their entirety, it is clear that the claims for alleged conversion and tortious interference with business relations seek to assert claims on behalf of DHTX, not on behalf of GLP and GLG individually.   Accordingly, such claims should have been brought as derivative claims pursuant to Federal Rule of Civil

Procedure 23.1 and Florida Statue 607.07401.  *See Foster-Thompson, LLC v. Thompson*, No. 8:04-cv-2128-T-30EAJ, 2005 U.S. Dist. LEXIS 29991 at *6 (M.D. Fla. Nov. 18, 2005) (holding that suit by a shareholder to claiming that defendants converted "assets and corporate opportunities of [the LLC]" must be brought as a derivative action.)

39.    Therefore, because Plaintiffs have inappropriately attempted to bring causes of action on behalf of DTHX, have not followed the heightened pleading requirements of Rule 23.1 or Florida Statues 607.07401 with respect to derivative actions, and have not included DHTX in this matter even as a nominal party as required under Florida law, they cannot meet their burden of showing a substantial likelihood of success on the merits of their conversion or tortious interference with business relations causes of action.

**B.    *Plaintiffs have not met their burden of proving a substantial likelihood of success with respect to alleged breaches of the MIPA.***

40.    In support of their request for a preliminary injunction, Plaintiffs allege the following breaches of the MIPA: 1) "failing to transfer the CLIA license to Cedar Creek Labs"; 2) "denying Plaintiffs access to DHTX books and records"; 3) "by entering into a competing agreement with Cirrus"; and 4) "by failing to file the required organizational documents with the Secretary of State for the Sate of Texas evidencing Plaintiffs

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   25**

membership interests in DHTX." *See* Doc. 12 p. 20.   Plaintiffs reiterate these same allegations in their Complaint.   *See* Doc. 6 p. 14-15.   As demonstrated below, Plaintiffs have not met their burden of proving a substantial likelihood of success with regard to any of these allegations.

**1.      CCL is a fully certified CLIA and COLA lab.**

41.   Plaintiffs plead no facts to support its bare allegation that CCL is not CLIA certified lab.   *See* Doc. 12 p. 11-12.   Accordingly, this fact in and of itself is insufficient to carry their burden for obtaining a preliminary injunction on this basis.   CCL purchased the CLIA license from an entity named MedicLab Clinical Laboratory LLC.   When CLIA issued the new certificate, it failed to change the name on the certificate to CCL.   However, the CLIA certificate bears the physical address of CCL and names Gerardo Ramos, CCL's lab director, as the laboratory director on the CLIA certificate.   *See* Exhibit S.   All of the paperwork has been submitted to the Department of Health and Human Services to correct this clerical error.   *Id*. In addition, CCL is a COLA certified lab as well which is an additional certification that assists CCL with ensuring to healthcare providers and payors that CCL is a reputable lab.   *Id*.   Upon request, Mr. Bruggemann provided this paperwork to GLP on February 16, 2018.   *Id*.   Accordingly,

there is no factual support, and no merit, to Plaintiffs' allegations with regard to CCL's CLIA status.

**2.  Plaintiffs' allegations that Defendants have denied them access to DHTX's books and records are unsupported.**

42.  In their Request for Relief 3, Plaintiffs seek the following relief:

> Order Defendants Bruggemann and Dividend Health or other third party entities owned and controlled by Defendants to provide Plaintiffs with reasonable access to DHTX financial books and records pursuant to the MIPA ("Request for Relief 3").

*See* Doc. 12 p. 3.  Accordingly, Plaintiffs have based their request for access to DHTX's books and records on their rights under the MIPA. Specifically, Plaintiffs direct the Court to section 4.1.6 of the MIPA which they refer to as the "Books and Records Provision," (*see* Doc. 12 p. 20) and quote said provision as follows:

> The purchaser and its employees, agents, accounting and legal representatives . . . to have reasonable access at reasonable times . . . to the books, records . . . and other business and assets of DHTX, DHD and Cedar Creek, wherever located.

*See* Doc. 12 p. 5.  Plaintiffs also cite the same provision in their Original Complaint.  *See* Doc. 6 para. 50(a).

43.  Section 4.1.6 of the MIPA is included in section 4 of the MIPA entitled "Covenants Prior to Closing."  *See* Exhibit B p. 5.  Section 4.1 entitled "Affirmative Covenants of the Seller" states, in pertinent part, that

"[t]hrough the Closing Date . . . Seller will cause DHTX, DHD and Cedar Creek to:."   Accordingly, section 4.1 should be read in conjunction with section 4.1.6, which, when read together, clearly means that the access to books and records provided to GLP pursuant to section 4.1.6 of the MIPA only extended "through the closing date" or "on or before the 22nd day of December, 2016 (the "Closing Date")" and defined in the MIPA.   *See* Exhibit B p. 3.   Therefore, GLP's access to certain books and records pursuant to section 4.1.6 ended on December 23, 2016, and is thus no longer available to GLP.

44.   In addition, even if section 4.1.6 still confers GLP rights to certain books and records, which Defendants deny, it provides only "reasonable access at reasonable times," not unfettered access to all records at any time.   DHTX utilizes three (3) major systems to manage its business: 1) QuickBooks; 2) DAQBilling; and 3) their bank accounts.   From these three sources, one has access to virtually all of the financial records of DHTX.   GLP has full online access to QuickBooks, and admits as much in their motion.   For example, Plaintiffs allege that they performed an analysis of "the QuickBooks entries for DHTX expenses" and even attached DHTX's entire general ledger to their motion as "Exhibit I."   *See* Doc. 12 p. 12.   In addition, Plaintiffs also have full online access to the DAQBilling program,

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   28**

and even attached, as "Exhibit K" to their motion, information directly from DAQBilling in what they refer to as the "Cedar Creek Labs Monthly Financial Summary." *See* Doc 12. P. 14. Plaintiffs also attach what they refer to as the "Cedar Creek Labs Billed Date DOS" as "Exhibit M" which also comes directly out of DAQBilling. *See*   Doc. 12 p. 15. Plaintiffs clearly have access to DHTX's bank accounts, and admit as much in several places in their motion ("Bruggemann withdrew $22,500 . . . from DHTX bank accounts" (*see* Doc. 12 p. 10);  "Bruggemann failed to deposit any monies required under the Amended Loan Agreements" (*see* Doc. 12 p. 13)). Plaintiffs also obviously have access to DHTX's contracts as they attach them to their motion (*see* Doc. 12 Exhibit G) and refer to them therein (the "Amended Loan Agreement with Servis First" (*see* Doc. 12 p. 13). Accordingly, although Plaintiffs claim that Mr. Bruggemann holds the "purse strings literally to the billing software, the bank accounts, but more importantly to the payments and specimens received," the facts that Plaintiffs plead to support their unfounded allegations stand in contradiction to this statement.

45.   In support of their motion, Plaintiffs attach a letter dated November 2, 2017 that makes a request for the following records:

1) The accounts and transaction ledgers for DHTX for 2017; and

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   29**

2) Profit and loss statements from July 1, 2017 to present.

*See* Doc 12 Exhibit H.  Plaintiffs then summarily claim that "[d]espite due demand, the requested financial records [in Exhibit H] were not provided in their entirety."  *See* Doc. 12 p. 11.  However, Plaintiffs never identify the specific records that were not provided.  In fact, as discussed above, the documents that Plaintiffs attach to their motion belie their claims that the requested records were not provided.  *See, e.g.,* DHTX' entire general ledger attached at Doc. 12 Exhibit I; the "Cedar Creek Labs Monthly Financial Summary" attached at Doc. 12 Exhibit K; the "Cedar Creek Labs Billed Date DOS" at Doc. 12 Exhibit M.

46.    Accordingly, Plaintiffs have not carried their burden to prove a substantial likelihood of success on the merits of their claim that Defendants breached the MIPA by "denying Plaintiffs access to DTHX books and records" (*see* Doc. 12 p. 20) because section 4.1.6 of the MIPA no longer provides such access, and Plaintiffs have, through their own pleadings, demonstrated that Defendants have provided them with reasonable access to DHTX's books and records.

**3.      Plaintiffs' request that Dividend "transfer the units of
DirectMed into DHTX" violates the status quo, and their
allegations that Defendants are violating the non-compete
provisions in the MIPA are unsupported.**

47.     Based on its allegations that Dividend is competing with
DHTX, which Defendants deny, Plaintiffs request a preliminary injunction
requiring that Dividend "transfer the units of DirectMed into DHTX."  *See*
Doc. 12 p. 2-3, 26.  While Plaintiffs claim that their request for a preliminary
inunction is "narrowly tailored to . . . preserve the status quo," (*see* Doc. 12
p. 2) this request is inarguably the antithesis of the status quo.  By this
request, Plaintiffs seek to achieve the very object of their lawsuit as plead in
their Complaint – "Direct that Defendants immediately transfer 100% of the
membership units of Directmed DX, LLC to DHTX, LLC to rightfully place
the contract by and between Cirrus and Directmed into DHTX control."  *See*
Doc. 6 p. 20.

48.     In cases where the relief requested that would alter rather than
maintain the status quo, the movant must meet a higher standard than a
preliminary injunction that would merely preserve the status quo. *See H2O
to GO, L.L.C. v. Martinez*, No. 05-21353-CIV, 2005 U.S. Dist. LEXIS
49317 at *6 (S.D. Fla. Aug. 22, 2005) (*citing Acierno v. New Castle County*,
40 F.3d 645, 653 (3rd Cir. 1994) (a party "seeking a mandatory preliminary
injunction that will alter the status quo bears a particularly heavy burden in

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   31**

demonstrating its necessity"); *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F. 2d 1096,1098-99 (10th Cir. 1991) (preliminary injunctive relief which would disturb the status quo "require[s] that the movant satisfy an even heavier burden of showing that the four factors . . . weigh heavily and compellingly in movant's favor").

49.    In Plaintiffs' motion, they do not even attempt to meet this heavier burden with respect to Request for Relief 1.   In their motion, Plaintiffs claim that Mr. Bruggemann disclosed to GLP that he was in negotiations with Cirrus prior to GLP's investment in DHTX, and after GLP invested in DHTX, Mr. Bruggemann brought a deal with Cirrus to DHTX ready to sign and fund. *See* Doc. 12. p 6-8.  However, as fully discussed above (*supra* sections II.A. and II.B.), when GLP failed to fund the transaction as promised and Cirrus discovered the nefarious backgrounds of SPG' members, at Cirrus's insistence, the deal with Cirrus was no longer available to DHTX.   However, as fully discussed above, Mr. Bruggemann was able to secure a deal with Cirrus through DirectMed, and bestowed all of the lab-related benefits on CCL via the Subcontractor Agreement. *Supra* section II.C.

50.    In their Complaint, Plaintiffs clearly state that the "DHTX entity was formed to operate a medical lab licensed in Texas under the name

Cedar Creek Labs ('Cedar Creek') to perform Urinary Tract infection testing and Toxicology testing of specimens provided from caregivers or other labs." *See* Doc. 6 p. 4.   Nowhere in their Complaint or their motion do the Plaintiffs plead any facts to suggest that any of the Defendants are operating a competing medical lab or performing any type of lab testing.   To the contrary, Defendants have demonstrated herein that they went to great lengths not to compete with DHTX or CCL by entering to the Subcontractor Agreement and authorizing CCL to enter into the Lab Services Purchase Agreement and the Reagent Purchase Agreement.   *Supra* section II.C. Again, as stated above, DirectMed has no employees, no lab, has collected no samples to be run at a lab, has conducted no lab tests nor referred any samples out to be tested at any lab, has collected no revenues, does not even own a bank account.   Plaintiffs have pled no facts to the contrary. DirectMed merely holds the contract with Cirrus that allows CCL to run the LDT's in its lab and reap all of the benefits associated therewith.

51.    Accordingly, not only have Plaintiffs not met their heightened pleading requirements for with respect to Request for Relief 1, they have not even pled sufficient facts to demonstrate that DirectMed is actually competing with DHTX or CCL.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   33**

**4.    Plaintiffs' allegations that Defendants have failed to file required organizational documents with the State of Texas are unsupported.**

52.    Plaintiffs' last alleged basis to support their breach of contract claim is also wholly unsupported.  While Plaintiffs claim that Defendants have failed to file "required documents," they do not identify the Texas authority allegedly requiring such documents to be filed nor do Plaintiffs identify the specific documents that they claim should have been filed.  In addition, if Plaintiffs believed that they were being irreparably harmed by this failure to have such "required documents on file," they have identified no reason why they could not themselves have filed them.  Defendants are unaware of any "required documents" that are in need of filing with the State of Texas with regard to Plaintiffs' membership interests in DHTX.

53.    Accordingly, Plaintiffs have not met their burden of proving a substantial likelihood of success with regard to their breach of contact claims.

**C.    *Plaintiffs' claims that they were fraudulently induced in entering into MIPA do not support their request for a preliminary injunction.***

54.    Aside from the fact that Plaintiffs have not pled sufficient facts to carry their burden with respect to their fraudulent inducement claim as demonstrated herein, even the likelihood of success on such claim does not support the injunction relief requested by Plaintiffs.   Requests for Relief 1

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   34**

and 3, are clearly based on allegations of breaches of the MIPA, and have been addressed in detail above. *See* section III.B. *supra*. Furthermore, because fraudulent inducement necessarily deals with alleged misrepresentations made in the past, in no way can such alleged misrepresentations be sufficient to support a request that Defendants be enjoined from engaging in conduct that allegedly would harm DHTX's business interest in the future which appears to be the purpose of Request for Relief 2. *See Klay v. United Healthgroup, Inc*., 376 F.3d 1092, 1098 (11th Cir. 2004) (noting that an injunction must be specifically based on a cause of action).

55.     In support of their claim for fraudulent inducement, Plaintiffs claim that Dividend represented that "DHTX was engaged in contract negotiations with Cirrus," and that Dividend's plan was for "the DHTX business to be grown in tandem with Cirrus." See Doc. 12 p. 6-7; Doc. 6 p. 5-7,  As discussed in detail in section II above, that was Dividend's plan so long as the ongoing negotiations with Cirrus culminated in an agreement. However, as fully discussed in section II above, when GLP failed to provide the funding for the Cirrus contract as promised causing Cirrus to further investigate SPG's member's checkered past, Cirrus pulled the deal from DHTX.  Accordingly, Plaintiffs' have not demonstrated the falsity of any of

the statements that either Dividend or Mr. Bruggemann allegedly made with regard to Cirrus prior to GLP's investment in DHTX.

56.     Furthermore, Request for Relief 2 is impermissibly vague.  For instance, it begins by requesting that the Court enjoin Defendants from "taking any action to jeopardize the Plaintiffs' interests in DHTX" and goes on to give certain examples of things Plaintiffs suggest would jeopardize such interests.  *See* Doc. 12. P. 27.  Plaintiffs, by their request, suggest that "transferring, disposing of, encumbering, or otherwise disposing of any assets of DHTX" should be enjoined.  *Id*.  Taken to its logical conclusion, this restriction would prevent Defendants from paying bills as that would dispose of the assets of DHTX. Federal Rule of Civil Procedure 65(d) provides that "every order granting an injunction … shall be specific in terms; [and] shall describe in reasonable detail … the act or acts sought to be restrained…." FED. R. CIV. P. 65(d).  Under this rule, "an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed."  *Hughey v. JMS Dev*., 78 F.3d 1523, 1531 (11th Cir.1996).  Requesting that Defendants be restrained from "any action to jeopardize the Plaintiffs' interests in DHTX" is simply too vague to give Defendants the appropriate notice of what acts Plaintiffs might consider to jeopardize their rights.

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   36**

## IV.    CONCLUSION

57.    Based on the foregoing, Defendants respectfully request that the Court deny the Plaintiffs' Motion for a Preliminary Injunction, and for all other relief to which they have shown themselves justly entitled.

Respectfully submitted,

**THE JORDAN LAW FIRM PLLC**
1204 Marquette Court
Southlake, Texas 76092
Telephone: (972) 369-9530
Fax: (972) 692-7116
dudley@dgjordanlaw.com

/s/ DUDLEY G. JORDAN
By: _____
**DUDLEY G. JORDAN**
TX. Bar No. 24032604

***Attorney for Defendants.***


## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2018, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Florida, using the CM/ECF electronic case filing system for U.S. District Courts, Northern District of Florida.


/s/ DUDLEY G. JORDAN
_____
DUDLEY G. JORDAN


**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW   37**

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)</u>

I hereby certify that this Response complies with Local Rule 7.1(f) because contains 7,900 words, excluding the case style, signature block and required certificates.


/s/ DUDLEY G. JORDAN

_____

DUDLEY G. JORDAN